AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  5:22-MJ-211 |
| Henry KIM | ) | |
| Laredo, Texas | ) | |
| Bok KIM | ) | |
| Laredo, Texas | ) | |
| | ) | |
| _Defendant(s)_ | | |

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 3, 2022___ in the county of ___Webb___ in the

___Southern___ District of ___Texas___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S. Code § 2320 | (Trafficking in Counterfeit Goods) Whoever intentionally (1) traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services, (2) traffics in labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive. |
| 18 U.S. Code § 371 | (Conspiracy) Conspiracy to commit offense or to defraud United States. |

This criminal complaint is based on these facts:

See "Attachment A".

☑ Continued on the attached sheet.

/s/ William P. Gregory
_____
_Complainant's signature_

William P. Gregory, HSI Special Agent
_____
_Printed name and title_

Submitted by reliable electronic means, sworn to, signature attested telephonically per Fed. R. Crim. P. 4.1:

Date: ___02/07/2022___

_Dica Soy Quiroga_
_____
_Judge's signature_

City and state: ___Laredo, Texas___

Diana Song Quiroga, U.S. Magistrate Judge
_____
_Printed name and title_

**[CONT ON BASIS OF COMPLAINT]**

## "ATTACHMENT A"

I, William Gregory, a Homeland Security Investigations (HSI) Special Agent (SA), have knowledge of the following facts derived, in part, from either my personal observations, my training and experience, and/or information obtained from other agents and witnesses:

1. On February 3, 2022, HSI SAs and HSI Task Force Officers (TFOs) from the Laredo Police Department were working in a plain-clothes undercover capacity at the 1000 Block of Hidalgo St, Laredo Texas. HSI agents were accompanied by a licensed private investigator herein referred to as INV-W1 retained by luxury fashion merchandise companies Chanel, Christian Dior, Gucci, Hermes, Louis Vuitton, Versace as well as others for the investigation of their Intellectual Property and Anti-Counterfeit Enforcement. INV-W1 is a licensed private investigator who is employed by Investigation Services Company, (I.S.C.). I.S.C. is under contract with several brand holders for the investigation of their intellectual property and anti-counterfeiting enforcement. INV-W1 acts in a representative capacity of the brand holders and holds the responsibility to assist federal, state, and local law enforcement agencies by providing expertise regarding authenticity of apparel and accessories, including clothing, watches, handbags, sunglasses as well as other items. INV-W1 has received, and continues to receive, training in apparel and accessories and the counterfeiting thereof.

2. HSI agents' duties were to locate and identify vendors selling merchandise displaying a trademarked design, logo, mark etc. HSI agents entered a clothing retail store named **TIEMPO BONITO COMPANY** doing business as (dba) trade name **Fashion Outlet** located at the 1000 Block of Hidalgo St, Laredo Texas. Inside the venue agents observed clothing on racks bearing the distinctive "Chanel", "Christian Dior", "Gucci", "Hermes", "Louis Vuitton", and "Versace" design. INV-W1 selected one of the suspected merchandise items from the sales floor and initiated an undercover purchase of one black shirt bearing the distinctive "Louis Vuitton" design imprinted on the front. INV-W1 tendered payment electronically using a Visa card for the purchase of the black shirt to a male employee later identified as **Henry KIM (H. KIM)**, part operator of the store. During the payment transaction INV-W1 asked **H.KIM** if the shirt was a replica or a copy, which **H.KIM** admitted it was a copy.

3. After showing knowledge of selling counterfeit trademarked shirt bearing the registered "Louis Vuitton" logo undercover agents departed the store. Agents returned to the store several minutes later to identify themselves as law enforcement and explained the reason for their presence at the venue was to investigate counterfeit merchandise. Agents obtained consent from **H. KIM** who represented himself as the part operator of the business and **Bok KIM (B.KIM)**, who represented herself as the mother of **H. KIM** and part operator of the business. Agents with the assistance of INV-W1 conducted a complete search the entire premises for counterfeit merchandise, inspected the items and were able to determine approximately three hundred and forty-six (346) clothing pieces were in fact counterfeit. The estimated manufacturer's suggested retail price (MSRP) for the 346 pieces of clothing total approximately $623,800.00 USDs in value. The breakdown of the counterfeit clothing seized was identified, as follows (Figure 1):

**[CONT ON BASIS OF COMPLAINT]**

**(Figure 1)**

| TRADEMARK | DESCRIPTION | QUANTITY | SELLER'S RETAIL PRICE | TOTAL SELLER'S RETAIL PRICE | MSRP PRICE | TOTAL MSRP PRICE |
|---|---|---|---|---|---|---|
| Louis Vuitton | Shirt - Blouse | 47 | $ 28.99 | $ 1,362.53 | $ 1,650.00 | $ 77,550.00 |
| Louis Vuitton | Shirt - Blouse | 8 | $ 29.99 | $ 239.92 | $ 1,650.00 | $ 13,200.00 |
| Louis Vuitton | Shirt - Blouse | 32 | $ 25.99 | $ 831.68 | $ 1,650.00 | $ 52,800.00 |
| Louis Vuitton | Shirt - Blouse | 12 | $ 27.99 | $ 335.88 | $ 1,650.00 | $ 19,800.00 |
| Louis Vuitton | Shirt - Blouse | 28 | $ 25.99 | $ 727.72 | $ 1,650.00 | $ 46,200.00 |
| Louis Vuitton | Shirt - Blouse | 13 | $ 23.99 | $ 311.87 | $ 1,650.00 | $ 21,450.00 |
| Louis Vuitton | Shirt - T-Shirt | 11 | $ 16.99 | $ 186.89 | $ 950.00 | $ 10,450.00 |
| Louis Vuitton | Track Pants | 1 | $ 19.99 | $ 19.99 | $ 2,080.00 | $ 2,080.00 |
| Louis Vuitton | Tracksuit | 4 | $ 39.99 | $ 159.96 | $ 5,830.00 | $ 23,320.00 |
| Chanel | Shirt - Blouse | 89 | $ 28.99 | $ 2,580.11 | $ 2,450.00 | $218,050.00 |
| Chanel | Shirt - Blouse | 4 | $ 25.99 | $ 103.96 | $ 2,450.00 | $ 9,800.00 |
| Chanel | Shirt - Blouse | 1 | $ 23.99 | $ 23.99 | $ 2,450.00 | $ 2,450.00 |
| Chanel | Shirt - Blouse | 1 | $ 27.99 | $ 27.99 | $ 2,450.00 | $ 2,450.00 |
| Chanel | Shirt - T-Shirt | 26 | $ 16.99 | $ 441.74 | $ 1,150.00 | $ 29,900.00 |
| Gucci | Shirt - Blouse | 12 | $ 28.99 | $ 347.88 | $ 1,400.00 | $ 16,800.00 |
| Gucci | Shirt - Blouse | 2 | $ 29.99 | $ 59.98 | $ 1,400.00 | $ 2,800.00 |
| Gucci | Shirt - Blouse | 9 | $ 25.99 | $ 233.91 | $ 1,400.00 | $ 12,600.00 |
| Gucci | Shirt - Blouse | 2 | $ 27.99 | $ 55.98 | $ 1,400.00 | $ 2,800.00 |
| Gucci | Track Pants | 3 | $ 19.99 | $ 59.97 | $ 1,300.00 | $ 3,900.00 |
| Gucci | Track Suit | 1 | $ 39.99 | $ 39.99 | $ 2,600.00 | $ 2,600.00 |
| Versace | Shirt - Blouse | 5 | $ 29.99 | $ 149.95 | $ 1,275.00 | $ 6,375.00 |
| Versace | Shirt - Blouse | 25 | $ 25.99 | $ 649.75 | $ 1,275.00 | $ 31,875.00 |
| Versace | Lounge Suit | 2 | $ 43.99 | $ 87.98 | $ 1,100.00 | $ 2,200.00 |
| Christian Dior | Shirt - Blouse | 6 | $ 27.99 | $ 167.94 | $ 1,450.00 | $ 8,700.00 |
| Hermes | Shirt - Blouse | 2 | $ 25.99 | $ 51.98 | $ 1,825.00 | $ 3,650.00 |
| **GRAND TOTAL** | | 346 | | $ 9,259.54 | | $623,800.00 |

4. INV-W1 inspected the 346 items recovered and found the quality of the items was not consistent with the trademark manufacturer, the labeling and packaging of the clothing was not consistent with that of the true manufacturer, and the items contained exact copies of protected marks and/or were substantially indistinguishable from, and/or confusing similar to a protected mark. INV-W1 provided a sworn affidavit detailing his findings.

5. Agents conducted voluntary interviews of **B.KIM** and **H.KIM** regarding the counterfeit merchandise discovered on site. During a post-Miranda interview, **B.KIM** and **H.KIM** admitted they knew the clothing was counterfeit and admitted they have been selling counterfeit clothing for approximately two years at this location for personal financial gain. **B.KIM** admitted that since business had slowed down during the COVID-19 pandemic they implemented the sale of counterfeit clothing and that she was aware it was illegal to sale. **B.KIM** and **H.KIM** admitted they had previously been sent a seizure notice from U.S. Customs and Border Protection (CBP) a few years ago regarding other counterfeit merchandise they attempted to acquire. **B.KIM** said she travels to California every two or three (2-3) months to select new counterfeit merchandise by coordinating via her mobile phone with a wholesaler company based out of California dealing in counterfeit clothing. **B.KIM** said she coordinates with a transportation company to have the counterfeit clothing transported from the wholesaler in California to her business in Laredo, Texas. **H.KIM** admitted he is aware that his mother **B.KIM** travels to California regularly to select new counterfeit merchandise and he admitted that his mother occasionally shows him images of samples of the clothing on her cellphone depicting what is being negotiated from the wholesaler in California that deals in counterfeit clothing. **H.KIM** admitted he believes the clothing is acquired originally from overseas.

6. **B.KIM** and **H.KIM** both admitted to sharing control over operating the retail store operations including the sale of counterfeit merchandise and admitted their business bank account lists both as authorized users. **B.KIM** and **H.KIM** both admitted the proceeds of the business clothing sales are deposited only into the

[CONT ON BASIS OF COMPLAINT]
business bank account after which they use the same account to pay themselves wages as employees of the business they own. **H.KIM** admitted they pay for the utilities of the business from the sales proceeds of the business.

7. HSI SAs entered "**Fashion Outlet**" in as a search term in Google and was led to a business Facebook webpage assigned https://www.facebook.com/fashionoutlet6/. Facebook is an online social media website which also allows sellers to post goods to be sold or marketed on a Facebook business webpage. These posts often include photographs of the goods being sold, a detailed description, information regarding the seller as well as reviews. HSI SA Gregory knows from training and experience that the Facebook profile owner must provide information to Facebook to open an account and advertise goods. This information generally includes the seller's identifiers such as name, email or mobile phone number, date of birth and gender. After the goods are posted on Facebook, the buyer can negotiate an online purchase of the goods from the seller, which often involves financial transactions occurring over the internet or phone line.

8. **Fashion Outlet**'s Facebook webpage displayed suspected counterfeit clothing advertised for sale at the **Fashion Outlet** located at the 1000 Block of Hidalgo St, Laredo Texas. The clothing appeared identical to the counterfeit clothing seized on February 3, 2022. The "about" section of the website stated that **Fashion Outlet** is a "Women's clothing store · Discount Store · Design & Fashion". The website further lists that **Fashion Outlet** may be contacted by telephone, indicating **Fashion Outlet** utilizes the internet and telephones as a platform to conduct business. Advertising terms via a business Facebook webpage such as "Discount" or "Design & Fashion" in connection with promoting supposedly discounted high end clothing brands could deceive a unsuspecting customer to mistakenly purchase what they believe to be genuinely authentic brands of clothing.

9. Agents performed an inquiry of available Department of Homeland Security (DHS) enforcement databases. The inquiry resulted in the discovery of several previous instances where HSI or CBP agents either interdicted counterfeit merchandise prior to it arriving at **Fashion Outlet** or seized counterfeit merchandise during a search inside **Fashion Outlet** on or about the years 2013, 2014, and 2015. DHS records indicate that CBP mailed notices of the seizure to **Fashion Outlet** which generally inform the violator of the prohibited conduct by citing the U.S. Code. DHS records indicate that HSI agents also personally spoke with representatives of **Fashion Outlet** in approximately 2014 and 2015 regarding their prohibited counterfeit merchandise. DHS records indicate **B.KIM** has owned the business since 2002 and **H.KIM** was reflected in DHS records as an employee of **Fashion Outlet** as far back as 2014.

10. HSI SA Gregory knows from training and experience that brand rights holders report experiencing: (i) lower sales volume and prices, (ii) damaged brand value, and (iii) lower royalties, because of spending on efforts to combat counterfeiting. The effects of counterfeiting on government come in the form of (i) lower tax revenues, (ii) the cost of anti-counterfeiting activities, and (iii) corruption.

11. Based on my training and experience and the facts set forth in this affidavit, your affiant submits that there is probable cause to believe that **B.KIM** and **H.KIM** have conspired together to utilize **Fashion Outlet** located at the 1000 Block of Hidalgo St, Laredo Texas, to facilitate the distribution of counterfeit goods, throughout the United States in violation of 18 US Code § 371 (Conspiracy to commit offense) and 2320 (Trafficking in Counterfeit Goods).

12. The counterfeit clothing was administratively seized for violations of 18 U.S. Code 2320; 18 US Code § 371 and 18 U.S. Code § 1343 - concerning trafficking counterfeit goods, conspiracy, and wire fraud.